A. NICOLE HALLETT
Illinois State Bar No.: 6334828
nhallett@uchicago.edu
EDWIN F. MANDEL LEGAL AID CLINIC
6020 S. University Ave.
Chicago, IL 60637
Tel: (203) 910-1980

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Selvin Argueta Caal and Selvin Aldair Argueta Najera, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 1:23-cv-00598 |
| v. | ) ) | |
| United States of America, | ) ) | |
| Defendant. | ) | |

## COMPLAINT

For the forced separation of a father and his minor child, plaintiffs Selvin Argueta Caal ("Selvin Sr.") and Selvin Aldair Argueta Najera ("Selvin Jr.") bring this complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671–2680, stating as follows:

## INTRODUCTION

1.     This action seeks damages for the U.S. government's forced separation of the Plaintiffs when they arrived in the United States seeking asylum. It concerns the government's inhumane and cruel policy of separating migrant families, as well as government officials' negligent and willful misconduct resulting in the Plaintiffs' severe physical and mental trauma that continues to this day.

2.     In May 2018, the Trump administration implemented its "Zero Tolerance" policy.[1] Under this policy, the government forcibly separated thousands of migrant families—including minor children as young as four months old—and referred adults for criminal prosecution.[2] After separating children and parents—often permanently[3]—the government detained them in harsh conditions and denied them medical care.[4]

3.     Inflicting pain and suffering was the goal of the "Zero Tolerance" policy. It was designed to punish migrants who dared to exercise their statutory right to seek asylum and to deter other asylum seekers from ever coming to the United States.[5]

4.     In May 2018, while this policy was in place, Selvin Sr. and his then 16-year-old son Selvin Jr. fled Guatemala to escape repeated, credible death threats from gangs. Selvin

---

[1] Miriam Jordan & Ron Nixon, *Trump Administration Threatens Jail and Separating Children From Parents for Those Who Illegally Cross Southwest Border*, N.Y. Times (May 7, 2018), https://www.nytimes.com/2018/05/07/us/politics/homeland-security-prosecute-undocumented-immigrants.html.

[2] Caitlin Dickerson, *The Youngest Child Separated from His Family at the Border Was 4 Months Old*, N.Y. Times (June 16, 2019), https://www.nytimes.com/2019/06/16/us/baby-constantine-romania-migrants.html.

[3] The Biden administration's reunification task force reported that, as of November 2022, there are still 780 children who have not been reunited with their parents, out of the 3,811 that were initially separated. Interagency Task Force on the Reunification of Fams., *Interim Progress Report* 4 (Nov. 2022), https://www.dhs.gov/publication/family-reunification-task-force-progress-reports.

[4] Camila Domonoske & Richard Gonzales, *What We Know: Family Separation and 'Zero Tolerance' at the Border*, NPR (June 19, 2018), https://www.npr.org/2018/06/19/621065383/what-we-know-family-separation-and-zero-tolerance-at-the-border.

[5] At the time, a Health and Human Services official described an urgent need for more beds for "tender age" populations "caused by the policy decision to separate kids from their families as a deterrent." E-mail from Gregory Davis, Director, Division of Unaccompanied Alien Children Planning and Logistics, to Scott Lloyd (June 2, 2018), https://www.documentcloud.org/documents/23557091-an-hhs-official-reports-there-are-a-bunch-of-tender-age-girls-stuck-in-border-patrol-stations-this-is-caused-by-the-policy-decision-to-separate-kids-from-their-families-as-a-deterrent; *see also* Philip Bump, *Here Are the Administration Officials who Have Said that Family Separation Is Meant as a Deterrent*, Wash. Post (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/; Caitlin Dickerson, *"We need to take away children": The Secret History of the U.S. Government's Family-Separation Policy*, The Atlantic (Aug. 7, 2022), https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/.

Sr. and Selvin Jr. came to the United States seeking safety and asylum. They did not attempt to cross the border undetected, but instead presented themselves to Customs and Border Protection ("CBP") officers as soon as the opportunity arose.

5.     Within hours of Selvin Sr. and Selvin Jr.'s arrival in the United States, officials forcibly separated them. The father and son were given no explanation as to why they were being separated, what would happen to them, or whether they would ever see each other again. This was the last time they would see each other for nearly two years.

6.     The government detained Selvin Jr., a minor, in cruel and inhumane conditions. Officers repeatedly kicked him and other children to wake them up or hurry them along. The government held him in freezing cells, with no mattress or blanket and very little food or water. Officials did not permit him to shower, brush his teeth, or even wash his hands with soap. For most of his detention, Selvin Jr. did not know where his father was, and officers refused to provide any information.

7.     Due to the government's mistreatment and inadequate medical care, Selvin Jr. developed constant and severe abdominal and testicular pain. When Selvin Jr. began experiencing these pains, officials made him wait weeks to receive over-the-counter pain medication, which did little to alleviate the pain. Selvin Jr. experiences pain to this day.

8.     Meanwhile, Selvin Sr. was detained in similarly cruel conditions. Like his son, the U.S. government transferred him between facilities that were freezing, cramped, and unsanitary, with very little food or clean water.

9.     Guards treated Selvin Sr. callously and aggressively. They ignored Selvin Sr.'s hunger, lack of hygiene, and pleas for help. Instead, they blamed him for his own suffering.

10.     Every day, Selvin Sr. asked government officials where his son was, but his requests

went unanswered. He felt scared and helpless, worried for his son's health and wellbeing.

11.     Selvin Sr. requested asylum to multiple federal officials but was denied a meaningful

opportunity to pursue it. Officers repeatedly misled him about his right to seek asylum

and about the purpose of paperwork they asked him to sign. At one point, officials

coerced him into signing a form that had no Spanish translation, which they told him

would allow his son to remain in the United States.[6] On September 4, 2019, a federal

judge ruled that the U.S. government unlawfully removed Selvin Sr. *L. v. U.S. Immigr. &*

*Customs Enf't*, 403 F. Supp. 3d 853, 867–68 (S.D. Cal. 2019).[7]

12.     Although Selvin Sr. and Selvin Jr. were finally reunited in 2020, the nearly two years of

forced separation permanently affected their relationship. The trauma inflicted upon then

16-year-old Selvin Jr. was particularly acute. Selvin Sr. grieves the lost time with his son,

having been unable to support him during the most harrowing experience of his life.

13.     The United States government forcibly and cruelly separated Selvin Sr. from his minor

son, Selvin Jr., and subjected both of them to imprisonment and mistreatment. Selvin Sr.

was also wrongfully deported. The actions of federal officials traumatized Selvin Sr. and

Selvin Jr., inalterably harming their physical and emotional wellbeing.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this claim for money damages against the United States

pursuant to 28 U.S.C. § 1346(b)(1). The Federal Tort Claims Act ("FTCA") "is a limited

---

[6] Officials noted ineffective language assistance in the administration of family reunifications forms. *See* E-mail from Veronica Venture, U.S. Government Official, to Tae D. Johnson, U.S. Government Official (July 5, 2018), https://www.documentcloud.org/documents/23558316-reports-that-reunification-forms-were-given-to-parents-in-languages-they-did-not-understand.
[7] Selvin Sr. is identified by his initials, S.A.C., in the court record.

waiver of the United States' sovereign immunity and imposes liability 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Ludwig v. United States*, 21 F.4th 929, 931 (7th Cir. 2021) (quoting 28 U.S.C. § 1346(b)(1)). In this case, since the acts and omissions occurred in Texas, Texas law applies.

15. Selvin Sr. and Selvin Jr. reside in Chicago, Illinois, which is within the Northern District of Illinois. Venue is therefore proper under 28 U.S.C. § 1402(b).

16. Selvin Sr. and Selvin Jr. have exhausted their FTCA administrative claims. On May 13, 2020, Selvin Sr. and Selvin Jr. served the relevant United States departments and agencies with all the required administrative forms for their claims through UPS overnight delivery and email. In a letter dated November 5, 2020, the Department of Justice acknowledged receipt of the administrative claims on behalf of itself and the Department of Health and Human Services on May 26, 2020 and May 19, 2020, respectively. The government provided no final disposition of Selvin Sr. or Selvin Jr.'s claims over the ensuing six months or in the over two-year interim since then. Therefore, Selvin Sr. and Selvin Jr. exercise their right to deem those claims denied pursuant to 28 U.S.C. § 2675(a) and to pursue their claims in federal court.

## PARTIES

17. Plaintiff Selvin Sr. is a 41-year-old Guatemalan man who, at age 37, was forcibly separated from his then 16-year-old son, Plaintiff Selvin Jr., by officials of the U.S. government. They had just completed an arduous 18-day journey to the United States to lawfully seek asylum, having fled credible death threats from a Guatemalan gang. The

separation occurred on May 19, 2018, and the father and son were not reunited until 21 months later, on January 25, 2020.

18. Defendant United States of America is the proper defendant under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2674. Selvin Sr. and Selvin Jr. sue the United States for personal injuries caused by the wrongful acts or omissions of its employees, including those of the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), United States Citizenship and Immigration Services ("USCIS"), Immigration and Customs Enforcement ("ICE"), the Department of Health and Human Services ("HHS"), and the Office of Refugee Resettlement ("ORR"). *See* 28 U.S.C. § 2671. Those employees were acting within the scope of their employment under circumstances in which the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the place where the acts or omissions occurred. 28 U.S.C. § 1346(b).

## STATEMENT OF FACTS

### A. The government forcibly separated Selvin Sr. and Selvin Jr. when they attempted to seek asylum.

19. Selvin Jr., then 16 years old, and his father, Selvin Sr., fled their home in Guatemala in May 2018. For years, gang members threatened Selvin Jr. and his family, culminating in an ultimatum that the gang would murder Selvin Jr.'s entire family if Selvin Jr. did not join the gang. Fearing for their lives, Selvin Sr. took his son to seek asylum in the United States. Because Selvin Sr.'s other son, who was six years old at the time, is severely disabled, his wife and five children remained in Guatemala.

20. After an arduous journey of approximately 18 days, traveling by foot, car, and bus through hazardous conditions, Selvin Sr. and Selvin Jr. reached the U.S.-Mexico border near Reynosa, Mexico on the night of May 18, 2018.

21. As they and roughly 50 other immigrants finally arrived at the border, CBP encountered and detained all of them. Their rejoice at having reached safety was short-lived as CBP's detention initiated a new series of traumas.

22. Selvin Sr. and Selvin Jr. were taken to the Rio Grande Valley Central Processing Center in McAllen, Texas. CBP instructed them to form a line with other parents and young children waiting to be fingerprinted.

23. The officials then ordered Selvin Sr. separated from his minor son. At first, Selvin Sr. believed that the officials were joking. But it was no laughing matter: the first step in their immigration process would begin with their forced separation.

24. When Selvin Sr. asked why they were being separated, an officer retorted that it was because they had committed a serious crime. Selvin Sr. was shocked and confused as to what crime they had committed. He wondered whether the separation was meant to punish them for seeking asylum.

25. Selvin Sr. and Selvin Jr. were taken to separate rooms in the *hielera* ("icebox" in English), which was divided by a window. Selvin Sr. and Selvin Jr. had no idea then that this would be the last time they would see each other for almost two years. Suddenly ripped apart, government officials did not even allow them to hug goodbye.

26. In a room with other boys, Selvin Jr. and other children cried, not understanding what was happening. Selvin Jr. was accustomed to always being with his father, and he was scared to be without him in an unfamiliar place. Selvin Sr. also saw parents with small children crying as they were physically dragged apart, some so distraught that they could not even walk. He did not understand how it was possible that a government could separate parents and children like this, with such cruelty and disregard for their safety.

27.     Unbeknownst to Selvin Sr. and Selvin Jr., they had entered the United States just one week after then-Secretary Kirstjen Nielsen had directed "all DHS law enforcement officers at the border to refer all illegal border crossers to the Department of Justice for criminal prosecution."[8] DHS had been "actively considering" a family separation policy since early 2017.[9]

28.     As CBP corralled Selvin Jr. toward an area with all the separated children, he tearfully asked an official what was going to happen to his father and when he would see his father again. The official laughed, saying, "Your dad isn't going to go with you. You're not a little kid. You shouldn't cry." This flippant response mirrored White House Chief of Staff John Kelly's statement that "the name of the [immigration] game is deterrence," and that children separated from their parents would be "put into foster care or whatever."[10]

     **B.  The government detained Selvin Jr., a minor at the time, in cruel and inhumane conditions and subjected him to unnecessary mistreatment that caused him long-lasting trauma and other harm.**

29.     The government detained Selvin Jr., a sixteen-year-old minor at the time, alone and apart from his parent, for approximately six months, until he was released to live with his uncle in Atlanta, Georgia. By that point, Selvin Jr.'s father, Selvin Sr., had already been unlawfully deported.

---

[8] Memorandum from Secretary Kirstjen Nielsen to Thomas D. Homan, Kevin K. McAleenan, and L. Francis Cissna (May 11, 2018), https://www.documentcloud.org/documents/6821451-USCIS-Records-Regarding-Stephen-Miller-and.html#document/p449/a562495.

[9] Sarah J. Diaz & Jenny Lee, *Zero Tolerance: Atrocity Crimes Against Migrant Children and Families in the United States: An Accountability Framework for Family Separation,* Center for the Human Rights of Children at 19 (Dec. 2022), https://www.luc.edu/media/lucedu/law/centers/chrc/pdfs/Zero%20Tolerance_Atrocity%20Crimes%20Against%20Migrant%20Children%20and%20Families%20in%20the%20United%20States_A%20Framework%20for%20Accountability.pdf.

[10] *Transcript: White House Chief of Staff John Kelly's Interview with NPR,* NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

30.     The officers' treatment of Selvin Jr. was cruel and callous. During the six-month detention in inhumane conditions, the officers kicked him, repeatedly ignored his pleas for information about what was happening to him and his father, actively humiliated him, and treated him as less than human.

31.     Initially, the government detained Selvin Jr. in a freezing cold *hielera*, where he was forced to sit on cold, concrete floors with more than 20 other boys, some as young as nine or ten. There were no beds, mattresses, or blankets to keep warm. Instead, the officers tossed him a small aluminum foil sheet to use as a blanket.

32.     Guards patrolled the rooms, kicking children awake. The officers kicked Selvin Jr. repeatedly, often on the knees. Afterwards, his legs were sore from where guards hit him.

33.     In addition to the freezing conditions and indiscriminate physical abuse, the *hielera* was dirty and provided no privacy. There was a single toilet stall in the room, only partially obscured from public view. There was one sink, but no soap. Selvin Jr. was not permitted to shower or brush his teeth.

34.     The *hielera* also had no windows. Selvin Jr. spent several days unable to distinguish between day and night.

35.     Three times a day, Selvin Jr. was given a small, frozen ham sandwich and a juice box. If he got thirsty at any other time, the officers forced him to drink from the bathroom sink. The water tasted bitter, and Selvin Jr. wondered whether it was safe to drink.

36.     Selvin Jr. feared for his safety because other boys in the *hielera* physically fought each other. The guards merely stood by and watched the children fight, condoning the behavior. Selvin Jr. felt endangered and helpless in a country that was meant to provide

him refuge from violence in his home country. Because of these conditions, Selvin Jr. hardly slept.

37. When Selvin Jr. cried out of anxiety, sadness, and desperation, because he was apart from his father, the officers laughed and humiliated him. The officers taunted him in Spanish, telling him to "stop acting like a little girl" and threatening that he would never see his father again. This behavior caused Selvin Jr. even greater anguish.

38. During his initial days of detention, government officials gave Selvin Jr. just one telephone call to a family member, but not to his father. This proved to be a disingenuous gesture of help. The officers confiscated the piece of paper with his uncle's phone number and forced Selvin Jr. to dial the number from memory. When Selvin Jr. tried dialing, the call did not connect. The officers did not allow Selvin Jr. another phone call.

39. After about two days in the *hielera*, Selvin Jr. was transferred by bus with approximately 30 other minors to another detention facility. When he arrived, he saw what looked like 500 people already there. Selvin Jr. once again searched for his father in vain. His requests for information about his father continued to go unanswered by guards.

40. Selvin Jr. was placed in a cell with about 70 other juvenile detainees in a facility known as the *perrera* ("dog kennel" in English). Like in the *hielera*, Selvin Jr. was given three cold ham sandwiches and two small water bottles a day. When Selvin Jr. drank his rations and became thirsty, he had to compete with 70 other boys for a single gallon of bitter-tasting water that the officers would put in the cell daily.

41. When he had to use the restroom, Selvin Jr. would have to ask permission to go to a port-a-potty outside the cell, without a sink or soap to clean his hands.

42. Like the *hielera*, this facility was extremely cold.

43. Federal officials also made it nearly impossible for Selvin Jr. to sleep. Officers again kicked children awake and loudly dragged their batons against the chain-link fences of the *perrera*.

44. Selvin Jr. felt completely alone and powerless. He continued to cry for his father. He did not understand what was happening to him and why. When he asked officers about his father, they ignored his pleas and continued to mock him.

45. After two days, Selvin Jr. was transferred again, this time to a facility in Baytown, Texas. No one explained to him why he kept being moved or what would happen to him. He kept asking about his father but again received no answer.

46. Once he was in the Baytown facility, Selvin Jr. was finally able to speak to his detained father twice; each call was not allowed to last more than three minutes. After his father was deported, Selvin Jr. was permitted only two or three calls, similarly brief, with his family in Guatemala.

47. It was during the first of these calls to Guatemala that Selvin Jr. learned his father had been deported. He immediately began sobbing and asked, "Dad, why are you back home?" Selvin Jr. felt helpless, uncertain about his future, and devastated that their difficult journey to the United States had been all for naught.

48. Selvin Jr. was detained in the Baytown facility for six months, feeling completely isolated and wondering whether he would ever see his family again. For the first time in his life, he spent his birthday among strangers, without his father or any of his loved ones.

**C. Selvin Jr. developed constant and severe abdominal and testicular pains that remain unresolved because of the detention facility's mistreatment and inadequate medical care.**

49. During his detention in the facility in Baytown, Texas, Selvin Jr. developed severe abdominal pain that expanded to testicular pain. The pain progressively worsened during his detention and persists to this day.

50. After approximately ten days in the facility, Selvin Jr. noticed a strange feeling in his stomach. He wondered whether he had been infected by the bitter-tasting water that he was forced to drink. Whenever he would eat, he sensed pain in his abdomen. This pain worsened over time, and he eventually could no longer sleep due to its severity.

51. Selvin Jr. also observed several other children in the detention facility experiencing similar physical pain. He saw them crying in pain and asking for their parents. He, too, missed the comforting presence and guidance of his father.

52. When the pain became unbearable, Selvin Jr. informed the officers about his condition. No immediate treatment was provided. Officers instead directed Selvin Jr. to fill out a form requesting medical treatment. Even then, Selvin Jr.'s medical request went unanswered. Still experiencing pain, Selvin Jr. requested medical treatment from facility staff again and again, about four requests total.

53. After approximately a week of worsening pain, officials finally allowed Selvin Jr. to see medical staff at the detention facility. The staff told him that he eventually might have to go to the hospital for treatment but did not specify whether or when he would be eligible to do so. The staff performed no physical examination and simply gave Selvin Jr. a couple of ibuprofen pills.

54. Approximately another 15 days passed without additional treatment. Selvin Jr. continued to experience severe, debilitating pain. Officials eventually acquiesced, and two officers

12

accompanied him to the hospital, staying on either side of him so that he could not escape. The officials threatened that it would end very badly if he tried to escape. Selvin Jr. was taken to a doctor at Texas Children's Hospital. The staff told him that he had a mild infection, but he did not receive antibiotics. The doctor told Selvin Jr. that he could continue receiving over-the-counter pain medication.

55. However, the pain continued to get worse. Selvin Jr. had trouble consuming food and sleeping due to the increasing pain spanning his abdomen to his testicles and upper thighs. Selvin Jr. asked to see a doctor again but was told he would have to wait. When he was finally taken to the hospital for a second visit, the doctor told him that he still had an infection and merely prescribed him more over-the-counter pain medication.

56. Even though Selvin Jr.'s pain did not resolve after the hospital visits, staff at the facility refused to take Selvin Jr. to the hospital again. Instead, the facility gave Selvin Jr. two pills of ibuprofen every three days, which did not mitigate the pain. Officials did not allow Selvin Jr. to take medication more frequently.

57. As a result of the detention facility's inadequate medical care, Selvin Jr. continues to live with the severe pain that developed while he was detained. The testicular pain is particularly intense. Selvin Jr. still struggles to sleep, work, or lift even moderately heavy objects, and he believes that the pain is more complicated than a hernia. As a result, pain has greatly affected his daily life.

### D. The government also detained Selvin Sr. in cruel and inhumane conditions and unlawfully deported him.

58. Officers detained Selvin Sr. for approximately two months until unlawfully deporting him to Guatemala in July 2018. During these two months, in addition to forcibly separating Selvin Sr. from his minor child and refusing to reunite them, officers detained

13

him in inhumane conditions, ignored his pleas for information about the whereabouts of his son, and treated him and other detainees like animals.

59.     Initially, like his son, Selvin Sr. was held in a *hielera*, where he was forced to sit on cold, concrete floors with dozens of other adult detainees. There were no beds, mattresses, or blankets to keep warm. Instead, the officers tossed Selvin Sr. an aluminum foil sheet to cover himself, which was so small that he initially thought it was a package of cookies.

60.     In addition to being freezing, the *hielera* was dirty and provided no privacy. There was a single toilet stall for dozens of adult detainees, only partially obscured from public view. There was one sink, but no soap. Selvin Sr. was not permitted to shower, brush his teeth, or even wash his hands with soap.

61.     Three times a day, Selvin Sr. was given a small sandwich, which consisted of one to two slices of lunch meat and a juice box. When other detainees begged for more food or water, the officers disregarded their pleas, saying "That's not my problem," or "It's not my fault that you came to the U.S."

62.     Due to insufficient drinking water, Selvin Sr. and other detainees had to drink from the single shared sink. Over the span of a few weeks, Selvin Sr. lost more than 20 pounds—so much weight that his pants no longer fit.

63.     The officers responded with indifference or outright vitriol to Selvin Sr.'s pleas to be reunited with his son. Selvin Sr. asked the officers about his son whenever he could, like any parent would after having their child ripped away in a foreign country, with no information as to why they were separated or where they were. The officers repeatedly refused to investigate where his son was and whether they would be reunited. Officers provided no information about Selvin Jr.'s care, location, or condition.

14

64.    Despite Selvin Sr. asserting his fear of returning to Guatemala, officers rebuffed his attempts to pursue an asylum claim. On May 19, 2018, officers removed Selvin Sr. from the *hielera* for questioning. The officer told Selvin Sr. that he could only answer "yes" or "no" to the officer's questions and that he was not allowed to ask any questions. If Selvin Sr. asked any questions, the officer threatened him with additional criminal charges. The officer asked Selvin Sr. whether he feared returning to Guatemala and whether he was seeking asylum in the United States. Selvin Sr. answered "yes" to both questions. Instead of referring Selvin Sr. to a USCIS asylum officer for further inquiry regarding his fear of returning to his home country, as required under 8 C.F.R. § 208.30(b), the officer pivoted and immediately threatened to have Selvin Sr. imprisoned for crossing the border illegally.

65.    The officer then ordered Selvin Sr. to sign a declaration in English. Selvin Sr. refused, explaining that, without translation, he could not understand what he was being asked to sign.

66.    After that encounter, the officer took Selvin Sr.'s belongings—his bible, backpack, and belt, which were confiscated during processing—and threw them into a trash bin in front of Selvin Sr., telling him that he had "nothing good." Selvin Sr. had brought the well-worn bible from Guatemala as a prized, sentimental possession. He was deeply offended that the officer would treat his bible as if it were garbage. Selvin Sr. was then returned to the *hielera*, where he spent another cold, sleepless, and hungry night.

67.    After two nights in the *hielera*, federal officers transferred Selvin Sr. by bus to another facility known as the *perrera*. Despite the inhumane treatment and uncertainty, Selvin Sr. remained hopeful, because an officer had told the detainees that they might see their

children at the new facility. This was a lie. There were only adult detainees at this *perrera*. Selvin Sr. spent eight nights there, worrying about his son's whereabouts and wondering what had happened to him.

68.    The *perrera* was as inhumane as the *hielera*. The bathroom in the *perrera* consisted of a single toilet stall behind a half wall, which Selvin Sr. had to share with approximately 60 other men. The *perrera* was so crowded that detainees slept next to the toilet on the floor. No one was allowed to shower or brush their teeth. Selvin Sr. vividly recalls the smell of the *perrera*; detainees covered their mouths with their shirts because of the unbearable stench.

69.    The officers in the *perrera* were just as aggressive with the detainees as the officers in the *hielera* had been.

70.    While he was being held in the *perrera*, Selvin Sr. was taken to a hearing in front of a magistrate judge in the United States District Court for the Southern District of Texas. *United States v. Argueta-Caal*, No. 7:18–po–04091 (S.D. Tex. May 22, 2018). He appeared with about 80 other people, all with their hands and legs chained. Selvin Sr. received minimal instruction about the hearing, but he learned that he was being charged with a crime for crossing the border. The attorney assigned to Selvin Sr. told him to plead guilty in the few moments they met prior to the hearing, although Selvin Sr. did not understand why he needed to plead guilty.

71.    After the hearing, Selvin Sr. was sent to another *hielera*. After one night, federal officials put him on a plane and transferred him to the Stewart Detention Center in Georgia, a private prison operated by Corrections Corporation of America under contract with ICE.

16

72.     At the Stewart Detention Center, guards handed Selvin Sr. a prison uniform. Only after

Selvin Sr. endured weeks of detention, filled with uncertainty and worry for Selvin Jr.,

did officials finally connect him with his young son. Officials allowed Selvin Sr. to speak

with his son for about three minutes. It was during this call that Selvin Sr. finally learned

the whereabouts of his son. Selvin Jr. was detained just like his father, except hundreds of

miles away in a detention center in Texas.

73.     While detained at Stewart, Selvin Sr. spoke to another official about his asylum claim. He

was told that a new rule had come into effect and that asylum would no longer be

granted. He was told to sign paperwork he did not understand, but he refused to do so.

Officials told him that he would be deported regardless. Selvin Sr. was never told his

credible fear disposition, nor did he learn of any opportunity to appear before an

immigration judge.

74.     One day, an official approached the detainees in Stewart with a piece of paper and asked,

"Who wants their child to stay in the U.S.? If you do, sign this." The paper was in

English, with no translation offered. Officials told Selvin Sr. that the form was not a

deportation order for Selvin Sr., and that he should sign it, or else he would be deported.

Selvin Sr. then believed he had no choice but to sign the document, so he did, despite not

knowing or understanding the true purpose of the document.

75.     After approximately one month at the Stewart Detention Center, Selvin Sr. was

transferred to Folkston Processing Center, a private detention facility owned and operated

by GEO Group, Inc. under contract with ICE. He was detained there for about a week.

76.     Selvin Sr. was allowed another brief call with his son before the government unlawfully

deported him back to Guatemala. Although Selvin Sr. did not know it, he had received an

expedited removal order. As Selvin Sr. was taken from the detention center and placed on multiple flights, he had no idea that Guatemala was his final destination. He only realized he was being deported once he was on the last flight to Guatemala.

77. When deported, Selvin Sr. was at the lowest point in his life. After risking their lives to seek asylum in the United States and to escape repeated death threats from the gang, Selvin Sr. had now been forced to abandon his son alone in a foreign land—an unbearable and traumatic experience for any parent.

**E. After a federal court found that Selvin Sr.'s deportation was unlawful and ordered his return to the United States, Selvin Sr. and Selvin Jr. were reunited after nearly two years of forced separation.**

78. After six months of detention in Texas, Selvin Jr. was sent to Atlanta, Georgia to live with his uncle. At this point, his father had already been deported to Guatemala.

79. On September 4, 2019, the United States District Court for the Southern District of California found that Selvin Sr.'s removal was unlawful because he was coerced into signing documents and forgoing review of his credible fear finding. *L v. U.S. Immigr. & Customs Enf't*, 403 F.Supp.3d 853, 867–68 (S.D. Cal. 2019). Pursuant to that litigation, Selvin Sr. was permitted to return to the United States. He reunited with his son in Chicago, Illinois on January 25, 2020.

80. Selvin Sr. and Selvin Jr.'s reunification was by no means guaranteed. As of November 2022, there were still 780 children who had not been reunited with their parents.[11]

---

[11] *Supra* note 3.

### F. Selvin Sr. and Selvin Jr. suffer ongoing emotional distress and trauma as a result of their forced separation and mistreatments.

81.     Selvin Sr. and Selvin Jr. have found it impossible to forget the horrible experience of being forcibly separated and kept apart for nearly two years. They have suffered stress, depression, and anxiety since their separation. They experience profound sadness and emotional distress when they recall the ordeal of being separated from each other and being detained in miserable and inhumane conditions. Selvin Jr. also continues to struggle with worsening physical pain.

82.     Selvin Sr. deeply regrets being unable to give Selvin Jr. the support his son needed during such a difficult and tumultuous time. After Selvin Jr.'s physical pain and illness developed, Selvin Sr. had no way to help his son obtain medical care. Government officials did not notify Selvin Sr. regarding his son's medical treatment or consult him prior to bringing his son to the hospital. Selvin Sr. knew that this period of separation was one where his son needed his advice and comfort the most. Selvin Jr. felt profoundly sad and confused while he suffered through his bouts of debilitating pain alone.

83.     Selvin Sr. was especially upset to have missed his son's seventeenth and eighteenth birthdays, which were beloved occasions in their family. Selvin Jr. had spent every other birthday with his father and felt terrible being apart from him. Selvin Jr.'s seventeenth birthday was May 27, 2018, when both of them were detained, unaware of where the other one was. On Selvin Jr.'s eighteenth birthday, Selvin Sr. was back in Guatemala because of his unlawful deportation.

84.     Although they were overjoyed to be reunified, Selvin Sr. and Selvin Jr.'s relationship has suffered. Selvin Jr. feels as though he had to fight alone to survive. Selvin Sr. worries that

their relationship may never be the same. Both of them struggle with the negative effects their forced separation has had on their father-son relationship.

85.     Selvin Jr. thinks every day about what happened to him while he was detained and separated from his father. Selvin Jr. experiences continuing emotional distress when he recalls how government officials kicked him, humiliated and laughed at him for asking to see his father, or simply ignored him. His physical pain is a constant reminder of his emotional pain.

86.     From the beginning, the U.S. government intended to use the trauma of family separation as a deterrent to migration, even against people fleeing violence and seeking asylum. According to notes from a call on May 11, 2018 involving then Attorney General Jeff Sessions and five U.S. Attorneys, Sessions said, "[W]e need to take away children" and that they "won't give amnesty . . . to people with kids."[12] The Acting ICE Director at the time, Tom Homan, who may have originally proposed the idea of family separation, stated, "Most parents don't want to be separated [from their children]. I'd be lying to you if I didn't think that would have an effect."[13]

87.     In spite of warnings from medical professionals about the devastating effects of family separation, the U.S. government forged ahead with its cruel policy. In a June 2018 letter, Physicians for Human Rights criticized the government's "intentional infliction of pain

---

[12] DOJ Office of the Inspector General, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 39 (Jan. 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.

[13] Diaz & Lee, *supra* note 9 (alteration in original) (quoting Caitlin Dickerson, *The Secret History of the U.S. Government's Family-Separation Policy*, The Atlantic (Aug. 7, 2022), https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/.

on children."[14] They further explained, "Forced separation of children and parents, especially in connection with the detention of a parent, can constitute an adverse childhood experience (ACE). ACEs are linked with disrupted neurodevelopment, resulting in social, emotional, and cognitive impairment, and have even been linked with negative intergenerational effects."[15]

88.    The U.S. government's forcible separation of Selvin Sr. and Selvin Jr. caused them irreparable emotional harm and, in Selvin Jr.'s case, ongoing physical injury. Because of the U.S. government's mistreatment of Selvin Jr. and Selvin Sr., they have experienced depression, anxiety, sadness, and stress. Their separation meant that they suffered this distressing treatment alone, devoid of each other's comfort and support. They lost important life moments like birthdays. Apparently as punishment for trying to lawfully seek asylum in the United States, they have suffered immense pain and experienced what no parent or child should ever have to endure.

## LEGAL CLAIMS

## COUNT 1

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

89.    The foregoing paragraphs of this complaint are incorporated as if set forth here.

90.    Intentional infliction of emotional distress in Texas has four elements: "(1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe." *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017).

---

[14] Letter from Physicians for Human Rights to Secretary Kirstjen Nielsen & Attorney General Jeff Sessions (June 14, 2018), https://s3.amazonaws.com/PHR_other/Separation_Letter_FINAL.pdf.
[15] *Id*.

91.    By engaging in the acts described above, federal officials and/or agents, at the direction

of the United States, engaged in extreme and outrageous conduct with the intent to cause,

or with reckless disregard for the probability of causing, Selvin Sr. and Selvin Jr. to suffer

severe emotional distress as a result of being separated from each other and the

conditions of their confinements, as well as Selvin Sr.'s eventual unlawful deportation.

92.    As a direct and proximate result of the government's conduct, Selvin Sr. and Selvin Jr.

have in fact suffered, and still continue to suffer, severe emotional distress.

93.    Under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671–2680,

the United States is liable to Selvin Sr. and Selvin Jr. for intentional infliction of

emotional distress.

## COUNT 2

### NEGLIGENCE

94.    The foregoing paragraphs of this complaint are incorporated as if set forth here.

95.    Under Texas law, a successful negligence claim must establish (1) the existence of "a

legal duty owed to the plaintiff by the defendant; (2) a breach of that duty; (3) an actual

injury to the plaintiff; and (4) a showing that the breach was the proximate cause of the

injury." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 314

(5th Cir. 2002) (citations omitted).

96.    The federal officials had a duty to Selvin Sr. and Selvin Jr. to act with ordinary care so as

not to cause them harm or injury.

97.    By engaging in the acts alleged herein, federal officials and/or agents, at the direction of

the United States government, failed to act with ordinary care and also breached their

duty of care to Selvin Sr. and Selvin Jr.

98.     As a direct and proximate result of the above-referenced conduct, Selvin Sr. and Selvin Jr. suffered substantial damages.

99.     Under the FTCA, the United States is liable to Selvin Sr. and Selvin Jr. for negligence.

## COUNT 3

### ABUSE OF PROCESS

100.    The foregoing paragraphs of this complaint are incorporated as if set forth here.

101.    "Abuse of process is the malicious use or misapplication of process in order to accomplish an ulterior purpose." *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App. 2001). Its elements are:

> (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage to the plaintiff as a result of such illegal act.

*Id*.

102.    Federal officials and/or agents abused legal processes within their control for the unlawful purpose of traumatizing Selvin Sr. and Selvin Jr., coercing them to abandon their lawful claims to asylum, and deterring future migrants from lawfully seeking refuge in the United States as is their right.

103.    Selvin Sr. and Selvin Jr. were injured by this misconduct, as described herein.

104.    Under the FTCA, the United States is liable to Selvin Sr. and Selvin Jr. for abuse of process.

## COUNT 4

### ASSAULT AGAINST SELVIN JR.

105.    The foregoing paragraphs of this complaint are incorporated as if set forth here.

106. One is deemed to have committed assault in Texas if the person either "(1) intentionally, knowingly, or recklessly causes bodily injury to another;" "(2) intentionally or knowingly threatens another with imminent bodily injury;" or "(3) intentionally or knowingly causes physical contact with another when he or she knows or should reasonably believe that the other will regard the contact as offensive or provocative." *City of Watauga v. Gordon*, 434 S.W.3d 586, 590 (Tex. 2014) (citing Tex. Pen. Code § 22.01(a)).

107. As set forth more particularly in the preceding paragraphs, government agents and/or officials on multiple occasions kicked Selvin Jr. while he was in their custody. These instances qualified as intentional and/or knowing physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

108. Under the FTCA, the United States is liable to Selvin Jr. for assault.

## COUNT 5

## TORTIOUS INTERFERENCE WITH FAMILIAL RELATIONSHIP / HARBORING OR ABDUCTING A MINOR CHILD AGAINST SELVIN SR.

109. The foregoing paragraphs of this complaint are incorporated as if set forth here.

110. One commits tortious interference with a familial relationship or the harboring or abduction of a child if they, "with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him." Restatement (Second) of Torts § 700 (1977).

111. As set forth more particularly in the preceding paragraphs, government agents and/or officials forcibly separated and kept apart a parent, Selvin Sr., from his minor child,

Selvin Jr. The government agents and/or officials knew that the parent did not consent, and yet compelled or induced a minor child to leave his parent and subsequently harbored his minor child despite repeated requests for reunification.

112.   Under the FTCA, the United States is liable to Selvin Sr. for tortious interference with a familial relationship and/or harboring or abducting a minor child against Selvin Sr.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs Selvin Argueta Caal and Selvin Aldair Argueta Najera, on behalf of themselves, respectfully request:

1.   Compensatory damages.

2.   Attorney's fees and costs. 28 U.S.C. §§ 2678, 2412(a)(1).

3.   Any further relief that the Court deems appropriate.

Dated: February 1, 2023.

Respectfully Submitted,

/s/ A. Nicole Hallett

A. NICOLE HALLETT
     Supervising Attorney
Jace Lee
Allison O'Connor
Fernando Stepensky
Alice Thompson
     Student Attorneys

nhallett@uchicago.edu
EDWIN F. MANDEL LEGAL AID CLINIC
6020 S. University Ave.
Chicago, IL 60637
Tel: (203) 910-1980

*Counsel for Plaintiffs*

25